# Exhibit A

Case 2:23-cv-08377-NGG-ST  Document 1-2  Filed 11/10/23  Page 2 of 21 PageID #: 8

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF SUFFOLK**

---------------------------------------------------------------------- x

Cross River Bank, d/b/a Lead Source,      :

                                    :

                    Plaintiff,       :      Index No.

                                    :

                    v.          :      Date Index No. Purchased:

                                    :

First Data Merchant Services LLC.      :

                                    :      **SUMMONS**

                    Defendant.      :

---------------------------------------------------------------------- x

To the above-named Defendant:

      **YOU ARE HEREBY SUMMONED** to answer the complaint in this action and to serve a copy of your answer, or, if the complaint is not served with this summons, to serve a notice of appearance, on the Plaintiff's attorney within 20 days after the service of this summons, exclusive of the day of service (or within 30 days after the service is complete if this summons is not personally delivered to you within the State of New York); and in case of your failure to appear or answer, judgment will be taken against you by default for the relief demanded in the complaint.

      The basis of jurisdiction is CPLR § 3001, and all other applicable provisions of the CPLR, including § 301 and § 302, because the parties agreed that the agreement governing all relevant conduct shall be governed by the laws of the State of New York and to submit to the exclusive jurisdiction of the state court sitting in Suffolk County, New York, for the adjudication of any dispute of any dispute that may arise under the agreement.

      Venue in this Court is proper pursuant to CPLR § 501 as, pursuant to the agreement governing all relevant conduct, the Parties have agreed that the state court sitting in Suffolk County, New York is the proper venue for legal actions arising under the agreement and

1

Case 2:23-cv-08377-NGG-ST   Document 1-2   Filed 11/10/23   Page 3 of 21 PageID #: 9

have thus waived any objection or forum non conveniens defense to the laying of venue in this

district.

Dated: New York, New York
      October 11, 2023

                        WINSTON & STRAWN LLP

                By:    */s/ George Mastoris*
                      George E. Mastoris
                      Thania ("Athanasia") Charmani
                      200 Park Avenue
                      New York, NY 10166
                      (212) 294-6700

                      Abbe David Lowell
                      1901 L Street, NW
                      Washington, DC 20036
                      adlowell@winston.com
                      (202) 282-5000

                      *Attorneys for Plaintiff*

TO:    First Data Merchant Services LLC
        2900 Westside Pkwy Alpharetta, Georgia, 30004

2

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF SUFFOLK**

---

Cross River Bank, d/b/a Lead Source,

Plaintiff,

v.

First Data Merchant Services LLC,

Defendant.

Index No.

**COMPLAINT FOR DECLARATORY
RELIEF AND DAMAGES**

Jury Trial Demanded

---

Plaintiff Cross River Bank (the "Company," "Cross River," or "Plaintiff") by and through

its undersigned attorneys, Winston & Strawn LLP, hereby submit this Complaint against Defendant

First Data Merchant Services LLC[1] ("First Data" or "Defendant," and together with Cross River,

the "Parties") for declaratory judgment and breach of contract. Cross River alleges upon

knowledge with respect to Cross River's own acts and upon information and belief as to all other

matters, as follows:

<u>**NATURE OF THE ACTION**</u>

1. This case presents a set of facts as straightforward as it is (regrettably) familiar: one

party's attempt to wriggle out of a contract early by making spurious allegations of breach.

2. Here, the party doing the wriggling is Defendant First Data. First Data bills itself

as a "global fintech and payments company" that provides its customers with financial technology

services, such as payments processing and credit card issuance.

---

[1] In 2019, First Data merged with Fiserv Inc.

1

3.      In 2018, First Data entered into a Referral Solutions Agreement (the "RSA" or the "Agreement") with Plaintiff Cross River, the nation's largest technology-driven financial services company. Cross River provides its clients—which range from the global companies leading today's financial technology revolution to local and regional fintech startups—with banking capabilities, compliance infrastructure, and risk management services.

4.      Under the RSA, Cross River agreed to "actively promote" First Data's services to its customers. In exchange, First Data agreed to pay Cross River monthly commissions based on the profits, if any, it made off of those Cross River customers who ended up utilizing First Data's services as a result of Cross River's referrals.

5.      Critically, Cross River did not guarantee (nor could it) that the customers to which it promoted First Data would end up becoming First Data's customers. At the end of the day, those customers would make their own decision as to whether First Data was right for them. Similarly, First Data did not guarantee that it would pay some minimum amount of commissions to Cross River; after all, if none of Cross River's customers signed up with First Data, there would be no commissions to be paid.

6.      From 2018 until today, Cross River did exactly what it said it would do, actively promoting First Data's payment services to its customers. Indeed, Cross River went well beyond its contractual obligations, inviting First Data executives to attend charity events and other social gatherings and introducing them to scores of potential customers. These efforts have paid off handsomely for First Data. To provide just one example, it was Cross River's promotional initiatives which led directly to First Data's longstanding and lucrative relationship with Coinbase—the nation's largest digital assets exchange, and a company which enjoys a tremendous amount of prestige and influence in the world of fintech and blockchain technology.

2

7. Unfortunately, after having reaped the benefits of its agreement with Cross River for more than five years, First Data has apparently decided it no longer wishes to pay the commissions it owes.

8. On May 1, 2023, First Data sent a letter to Cross River asserting that Cross River was in breach of the RSA (the "May 1 Letter") and invoking its contractual right to terminate the RSA within 30 days for good cause. First Data did not deign to provide any legal or factual support for that accusation; rather, it merely stated in conclusory fashion that "the prospective leads generated by [Cross River] under the Agreement do not meet [its] obligations thereunder to 'actively promote the Payment Services' and to provide First Data with 'contact information for those business that indicate to [First Data] their interest in Payment Services[.]'"

9. True to its word, and notwithstanding its continuing lucrative relationship with Coinbase, First Data did not pay Cross River any of the commissions it owed under the RSA for June or July 2023. (Nor has it paid any such commissions since.)

10. Cross River responded to the May 1 Letter with its own "Demand Letter," sent on August 18, 2023, which sought payment from First Data for the amounts then in arrears. The Demand Letter also rejected First Data's claims that Cross River had breached the RSA and made clear that the May 1 notice of termination was thus invalid.

11. On September 11, 2023, First Data sent Cross River a letter purporting to explain the alleged breach. In particular, First Data claimed that Cross River had allegedly "provided contact information only once, in 2019, for Coinbase, Inc," (the "September 11 Letter").

12. Critically, however, the September 11 Letter went on to betray a profound lack of faith in the position First Data had aggressively staked out. Not only did it acknowledge that First Data's own records might not be accurate (perhaps because of data lost as a result of the merger

3

between Fiserv and First Data), but it also noted that if Cross River had indeed performed its obligations to "actively promote" First Data to its customers, then First Data wished to terminate the RSA on the first date it could absent good cause, which was April 27, 2024 (the date on which the current term expires). But if First Data was not even certain that a breach had occurred, why was it sending a notice of termination based on such an alleged breach?

13. The RSA's terms provide the clear—and all too predictable—answer. Absent "good cause" to terminate the Parties' agreement, First Data would need to provide notice of termination at least 180 days before the expiration of the Agreement's current one-year term (on April 27, 2024), and then continue paying commissions for a period of six months after that term expired. In other words, First Data's May 1, 2023 termination of the RSA would obligate it to continue paying monthly commissions to Cross River through October 27, 2024.

14. By contrast, if First Data somehow had "good cause" to terminate the Agreement, it could do so upon thirty days' notice, and would have no future payment obligations once that thirty-day period had run.

15. The difference was significant: First Data's premature and baseless allegation that Cross River had breached the RSA stood to save it seventeen months of commissions—an amount, based on historical trends, of close to $4 million.

16. Recognizing First Data's gambit for what it was, Cross River responded, through counsel, to the September 11 Letter on September 21, 2023 (the "September 21 Letter"). In that response, Cross River explained again that its contractual obligations to First Data were limited to "active promotions" and did not include any promises or guarantees that Cross River customers would ultimately avail themselves of First Data's services. Given First Data's apparent lack of knowledge regarding the Parties' past dealings, Cross River also provided First Data with around

4

Case 2:23-cv-08377-NGG-ST Document 1-2 Filed 11/10/23 Page 8 of 21 PageID #: 14

a dozen examples of entities to which Cross River had actively promoted First Data's services but that had chosen not to do business with First Data despite these promotional efforts.

17. Additionally, Cross River requested (a) payment of all commissions owed to date under Section 4.1 of the RSA; (b) a commitment in writing that First Data would pay all commissions owed up through October 27, 2024 (as specified by the RSA); and (c) that First Data provide it with all records in its possession relating to commissions owed under the Agreement since May 1, 2023, as permitted under Section 4.7 of the RSA.

18. Rather than agree to abide by its obligations under the RSA or take Cross River up on its offer to discuss the parties' dispute, First Data simply chose to remain silent.

19. Prior to filing this suit, Cross River made one more good faith effort to resolve this dispute amicably. On October 10, 2023, Cross River (again through counsel) wrote to First Data noting that it had not received a response to its September 21 Letter and informing First Data that, should the latter not commit to meeting its obligations under the RSA, Cross River would have no choice but to file suit (the "October 10, 2023 Letter"). But it also offered to delay the filing of any lawsuit should First Data merely commit to engaging Cross River in good faith negotiations over the parties' dispute.

20. This time, First Data did not remain silent. It doubled down on its earlier, unfounded position that Cross River had breached its obligations under the RSA—a position for which it again provided no evidence. It misrepresented the language of the RSA and the facts surrounding the way in which it was entered. And it provided no explanation for First Data's current and continuing breach of its payment obligations to Cross River.

21. Accordingly, Cross River now seeks a declaratory judgment, pursuant to CPLR § 3001, that it did not breach the RSA, and that First Data thus may not avail itself of any of the

5

rights it is permitted to exercise in the event of a breach, including the shorter 30-day termination period provided for under Section 5.2 of the RSA. Cross River seeks this remedy to protect its rights under the RSA and resolve what is a ripe case or controversy concerning the respective rights, obligations, and duties of the Parties.

22.      Relatedly, Cross River also seeks a declaratory judgment that First Data shall fulfill its payment obligations to Cross River through the expiration of the RSA's current term on April 27, 2024 and for a period of six months thereafter.

23.      Finally, First Data has breached the Agreement by not fulfilling its payment obligations under the Agreement and noticing a termination for cause pursuant to a breach that never occurred. First Data's breach has already caused Cross River hundreds of thousands of dollars in damages and, should that breach continue through the end of the Parties' mutual obligations, will reach an amount estimated at roughly $4 million.

## THE PARTIES

24.      Cross River is a New Jersey organization with its headquarters located at 400 Kelby St, Fort Lee, New Jersey 07024.

25.      Upon information and belief, First Data is a Delaware limited liability company with its principal place of business located at 2900 Westside Pkwy Alpharetta, Georgia, 30004.

## JURISDICTION

26.      Jurisdiction in this Court is proper pursuant to CPLR § 3001, and all other applicable provisions of the CPLR, including § 301 and § 302, because the Parties agreed that the Agreement shall be governed by the laws of the State of New York and to submit to the exclusive jurisdiction of the state court sitting in Suffolk County, New York, for the adjudication of any dispute of any dispute that may arise under the Agreement.

6

## **VENUE**

27.     Venue in this Court is proper pursuant to CPLR § 501 as, pursuant to the Agreement, the Parties have agreed that the state court sitting in Suffolk County, New York is the proper venue for legal actions arising under the Agreement and have thus waived any objection or *forum non conveniens* defense to the laying of venue in this district.

## **FACTUAL BACKGROUND**

28.     Cross River, a New Jersey state-chartered FDIC insured bank founded in 2008, is the nation's largest technology-driven financial services company.  Cross River is a leader in innovative financial technology, providing products and services that enable fintech companies to grow their businesses and function in a secure and regulatory-compliant environment.

29.     Cross River serves an important role in local communities.  It has over 500 employees and is the second largest PPP lender in the country.  Cross River's executives frequently attend volunteer programs and charity events in the community.  The bank also partners with organizations to give back to local communities and businesses by supporting workshops, learning sessions, and grant programs.  For instance, in 2022, Cross River established Foundation@Cross River to fund initiatives, programs and projects that seek to provide not-for-profit and community organizations with funds and services that they need to build the foundation of education, community and technology tools for the future.

30.     On April 27, 2018, Cross River entered into the RSA with First Data, which, among other things, provided that Cross River would promote First Data's PayPoint and Buypass products (together, the "Payment Services").

31.     The Agreement describes the Parties' respective obligations in detail.  Section 2.1 provides that Cross River "will actively promote the Payment Services in a professional manner,

using materials that Company approves or periodically provides. [Cross River] will provide [First Data] with contact information for those businesses that indicate to [Cross River] their interest in the Payment Services (Prospects). [First Data] will promptly contact the Prospects."

32.     Section 4.1 lays out First Data's obligations under the Agreement, providing that "[First Data] will pay [Cross River] a commission equal to 45% of the Payment Services Net Recurring Acquiring Revenue collected during a calendar month from each Payment Client that is actively using the Payment Services."  The provision defines Net Recurring Acquiring Revenue as "the total fees and discounts paid by a Payment Client for card transactions under its Service Agreement, minus (1) application, administrative, Saas, security, and equipment fees, (2) chargebacks, and (3) all interchange, fees, and assessments charged by card associations in connection with Payment Clients' transactions, acts, or omissions."

33.     Pursuant to Section 4.7, "[Cross River] may request a copy of Company's records related to commissions owed under th[e] Agreement if (i) it reasonably believes that a material error has been made and (ii) once every 12 months. . . ."

34.     Section 4.5 provides that "[n]o minimum commissions will be due or payable under this Agreement, and nothing in this Agreement constitutes a representation, warranty, obligation, or other commitment by [First Data] to pay a minimum commission to [Cross River]."

35.     Section 5 governs the "Term and Termination" of the Agreement.  Section 5.1 states that the Agreement would "continue for an initial term of 5 years; provided that [Cross River] d[id] not provide notice to [First Data] of its intention to terminate at the end of 3 years from the date of th[e] Agreement (Initial Term)."  After the Initial Term, the Agreement "will renew for successive 1-year periods (each, a Renewal Term), unless either party gives the other written notice of non-renewal at least 180 days before the end of the Initial Term or the current Renewal Term."

8

Case 2:23-cv-08377-NGG-ST   Document 1-2   Filed 11/10/23   Page 12 of 21 PageID #: 18

36.     Section 5.2 further provides that either party may terminate the Agreement outside the parameters of Section 5.1 in certain circumstances, including "with written notice if the other party breaches this Agreement and fails to remedy the breach within 30 days of receiving written notice of the breach," and "(2) with written notice if the other party repeatedly breaches this Agreement."

37.     Section 5.3 also dictates that when the Agreement terminates, "[Cross River] will stop promoting the Payment Services . . . [First Data] will continue to pay commissions to [Cross River] for 6 months after termination of this Agreement.  However, if this Agreement is terminated . . . by [First Data] pursuant to Section 5.2, [First Data] will stop paying commissions to Lead Source upon such termination."

38.     Since entering into the Agreement on April 27, 2018, and until the May 1 Letter, Cross River had fulfilled all of its obligations under the Agreement.

39.     On May 1, 2023, First Data sent a letter abruptly seeking to terminate First Data's and Cross River's relationship.  The May 1 Letter claimed, for the first time, that Cross River was in breach of the Agreement and purported to provide a 30-day termination notice pursuant to Section 5.2 of the Agreement.

40.     Specifically, while the May 1 Letter conceded that Cross River had "generated" "prospective leads" under the Agreement, it stated that "in [First Data's] review of historical referral activity under [the Parties'] collective referral relationships, First Data has determined that the prospective leads generated by [Cross Rive] . . . do not meet [Cross River]'s obligations thereunder to 'actively promote the Payment Services' and to provide First Data with 'contact information for those business that indicate to [First Data] their interest in Payment Services. . .' pursuant to Section 2.1 of the Agreement."  The May 1 Letter also provided notice of First Data's

9

intent to terminate the Agreement within thirty days under to Section 5.2 of the Agreement pursuant to Cross River's purported breach.

41.     In response, on August 18, 2023, Cross River sent the Demand Letter requesting "immediate payment of all outstanding payment amounts" under the Agreement.  The Demand Letter provided notice to First Data that the May 1 Letter "declaring [First Data's] intent to terminate the Agreement within 30 days of receipt, was invalid and has no legal force or effect as [Cross River] did not breach its obligations under the Agreement."  The Demand Letter also explained that "[t]he Initial Term of the Agreement expired on April 27, 2023, and automatically renewed as per the terms of the Agreement. The current Renewal Term is scheduled to expire on April 27, 2024."

42.     On September 11, 2023, First Data responded to the Demand Letter, insisting that Cross River breached the Agreement because it allegedly "provided contact information only once, in 2019, for Coinbase, Inc."

43.     The September 11 Letter invited Cross River to provide evidence of additional referrals to First Data over the course of their Agreement, stating that "[i]f [Cross River] has records of contact information provided for Prospects (as defined in the Agreement) other than Coinbase, Inc. since 2019, please forward them for our review."  The September 11 Letter noted that "[i]f no such records exist, First Data will continue to consider its termination valid and, consequently, the Demand Letter without merit."  Tellingly, it also stated that if Cross River provided information on additional promotions, then the September 11 Letter would constitute notice of termination following the end of the current Renewal Term on April 27, 2024.  In other words, First Data was explicitly acknowledging that its assertion of breach might be meritless—a remarkable admission.

10

44.     On September 21, 2023, Cross River again responded to First Data's allegations and gave First Data yet another opportunity to affirm its commitment to its contractual obligations.

45.     As an initial matter, the September 21 Letter again rejected, in detail, First Data's claims that Cross River had breached the Agreement.

46.     It began by noting that the "[t]he sole evidence [First Data] provide[s] of any such 'breach' is [its] assertion, based on 'First Data's records,' that Cross River 'has provided contact information only once,' for Coinbase, Inc," explaining that First Data's assertion "is both logically and legally divorced from the question of whether there has been a breach of the Agreement."

47.     In particular, and as set forth above, Section 2.1 requires only that Cross River "actively promote the Payment Services" and "provide [the] Company with contact information for those businesses that indicate to [Cross River] their interest in the Payment Services," defining such contacts as "Prospects."  The Agreement does not require Cross River to provide First Data with the "contact information" of some minimum number of third-party entities, nor does it guarantee that any of those entities will eventually utilize First Data's Payment Services.  To the contrary, the Agreement makes clear that Cross River is only to provide contact information for third parties that "indicate" an interest in the Payment Services.  Therefore, Cross River's obligation to provide a third party's contact information to First Data hinges entirely on whether that third party expressed interest in Payment Services.  Cross River can do nothing more than promote First Data's Payment Services to its customers.  It certainly cannot force those customers to express an interest in First Data.

48.     Moreover, First Data's May 1 and September 11 Letters both conceded that Cross River has provided Prospects, which is all that Cross River is required to do under the Agreement.

11

Case 2:23-cv-08377-NGG-ST   Document 1-2   Filed 11/10/23   Page 15 of 21 PageID #: 21

49.     First, as the September 11 Letter recognized, it was Cross River's promotional initiatives which led directly to First Data's longstanding and lucrative relationship with Coinbase. First Data's relationship with Coinbase is evidenced by the fact that on June 5, 2019, the Parties entered into an Amendment to Referral Solutions Agreement solely for the purpose of memorializing the terms of the commissions to be paid to Cross River pursuant to First Data's provision of payment processing services to Coinbase. The Amendment also included a revised notice address for Cross River and noted that the Parties intended no other substantive changes to the Agreement. Since then, First Data has willingly paid regular (and significant) commissions to Cross River in connection with the Coinbase promotion and resulting relationship.

50.     Second, the May 1 Letter concedes that Cross River "generated" "prospective leads," which certainly satisfies the Agreement's requirement under Section 2.1 that Cross River promotes the First Data's services to "Prospects," i.e., third parties that "indicate" an interest in the Payment Services.

51.     Third, the September 21 Letter directly addressed the September 11 Letter's request to provide information on additional referrals, stating that Cross River expended significant time and resources attempting to promote First Data's services to a number of other companies, including, but not limited to, MiCamp Solutions, Unified Payments/Netevia, PaySafe, Shift$, Qolo, BridgePay, PayTM, UniPass, Paycertify, SecurionPay, ExactPay and GreenBox (RYVYL). Going above and beyond its contractual obligations, Cross River also invited First Data executives to attend charity events and other social gatherings at which they were introduced to Cross River customers who might be interested in the services offered by First Data.

52.     Finally, the September 21 Letter reiterated Cross River's demand that First Data "(1) withdraw [its] allegations of a breach by Cross River; (2) remit to Cross River all monies

12

currently owed to it under Section 4.1 of the Agreement; and (3) commit in writing to paying all commissions it will owe to Cross River from the present date up until a period of six months after termination of the Agreement on April 27, 2024." Additionally, Cross River invoked its rights under Section 4.7 of the Agreement and requested that First Data "provide it with all records in its possession related to commissions owed under this Agreement since May 1, 2023, due to Cross River's reasonable belief that First Data's failure to pay any commission in June, July, and August of this year was a 'material error' as that term is used in the Agreement." The September 21 Letter requested that First Data responds to Cross River's demands no later than September 27, 2023.

53. When more than two weeks went by with no word from First Data, Cross River again reached out to First Data.

54. On October 10, 2023, Cross River sent First Data a letter noting that the latter had not yet responded to the September 21 Letter and reiterating its position that Cross River had not breached Section 2.1 of the RSA. Cross River again demanded that First Data pay the commissions it currently owes under the Agreement and commit to satisfy all monthly commissions that would become due and owning up through and including October 27, 2024 (six months after expiration of the Agreement).

55. Cross River informed First Data that should it not commit to satisfy its obligations under the RSA, it would leave Cross River with no choice but to bring the instant lawsuit. But Cross River also offered First Data a path to avoid litigation, noting that it would be willing to delay its filing for at least a month if First Data committed to engaging in good faith negotiations with Cross River in the interim. First Data refused to take Cross River up on its offer, penning a terse response which suggested strongly that it would exploit any further efforts towards an

13

amicable resolution to bring its own lawsuit against Cross River ("First Data's October 10 Letter Response").

56.     Additionally, First Data's October 10 Response also failed to grapple substantively with any of the evidence that Cross River had provided with respect to (a) First Data's breach of the RSA and (b) Cross River's successful good faith efforts to comply with same. Nor could it, as discussed both above and in the September 21 Letter.

57.     First Data's motive in staking out the position it has taken could not be more transparent.  Under the RSA, termination of the Agreement by First Data in the absence of a material breach by Cross River must be noticed at least 180 days before the end of the current term (which expires in April 2024) and requires First Data to continue paying commissions for a period of six months after termination.  By ginning up a pretextual breach of contract, First Data has impermissibly sought to avail itself of the shorter, 30-day notice period provided by Section 5.2 of the Agreement in cases of breach, thus saving itself roughly seventeen months of commissions (approximately $3.9 million based on current trends), that it owes (or will owe) to Cross River.

58.     It is unfortunate that after five years of a successful and mutually profitable business relationship, First Data has chosen to employ such tactics to evade its obligations under the RSA. At the end of the day, however, First Data is still contractually bound to perform its obligations under the Agreement and pay to Cross River what it owes.

14

## COUNT I – DECLARATORY JUDGMENT PURSUANT TO CPLR § 3001

59.     Plaintiff repeats and incorporates each and every allegation of this Complaint as if fully set forth herein.

60.     An actual case or justiciable controversy exists between Plaintiff and Defendant over the respective rights, obligations, and duties of the Parties pursuant to the Agreement.

61.     The issuance of declaratory relief by this Court will terminate some or all of the existing controversy between the Parties and provide certainty to the Parties with respect to their rights, duties, and obligations under the Agreement.

62.     Plaintiff alleges that it fulfilled (and continues to fulfill) its contractual obligations under Section 2.1 of the Agreement to "actively promote [First Data's] Payment Services" and "provide [First Data] with contact information for those businesses that indicate to [Cross River] their interest in the Payment Services (Prospects)."

63.     Thus, Plaintiff alleges that it has satisfied its obligations pursuant to Section 2.1 of the Agreement and is not in breach of the Agreement.

64.     Accordingly, Plaintiff alleges that Defendant cannot avail itself of the 30-day notice period provided under Section 5.2 of the Agreement because the provision can only be invoked "if the other Party breaches the Agreement."

65.     Plaintiff thus alleges that Defendant owes Plaintiff all outstanding commissions pursuant to Section 4.1 of the Agreement.

66.     Plaintiff further alleges that Defendant should fulfill its obligations under Section 4.1 of the Agreement and pay any commissions that continue to accrue and will accrue through the end of the current term which is set to expire on April 27, 2024.

15

Case 2:23-cv-08377-NGG-ST Document 1-2 Filed 11/10/23 Page 19 of 21 PageID #: 25

67.     Plaintiff requests a judicial determination that: (i) Plaintiff is not in breach of Section 2.1 of the Agreement; (ii) Defendant cannot avail itself of the early termination provision contained within Section 5.2 of the Agreement; (iii) Defendant owes Plaintiff all outstanding commissions pursuant to Section 4.1 of the Agreement; (iv) Defendant has an obligation to continue meeting its obligations to Cross River under Section 4.1 for as long as the Agreement's terms are in force, including all commissions that become due and owing up through October 27, 2024; and (v) Defendant has an obligation under Section 4.7 of the RSA to provide Cross River with all records in its possession relating to commissions owed under the Agreement since May 1, 2023.

68.     Such a declaration is necessary and appropriate at this time in order for Defendant to perform its obligations under the Agreement.

69.     Therefore, the Court should issue a declaratory judgment regarding the Agreement between the Parties and providing the aforementioned relief.

### COUNT II– BREACH OF CONTRACT

70.     Plaintiff repeats each and every allegation of this Complaint as if fully set forth herein.

71.     The Parties have a valid and enforceable contract.

72.     Plaintiff has performed all its obligations under the Agreement.

73.     Defendant materially breached the Agreement by wrongfully alleging that Plaintiff breached the Agreement and not fulfilling its payment obligations pursuant to Section 4.1 of the Agreement for outstanding commissions.

74.     Defendant further materially breached the Agreement by wrongfully alleging that Plaintiff breached the Agreement and by seeking to illegitimately enforce its powers under the

16

Case 2:23-cv-08377-NGG-ST Document 1-2 Filed 11/10/23 Page 20 of 21 PageID #: 26

Agreement, including pursuant to Section 5.2 of the Agreement by asserting a 30-day termination notice in order to evade its recurring payment obligations pursuant to Section 4.1 of the Agreement through the current term set to expire on April 27, 2024.

75.     As a result of Defendant's breach, Plaintiff has suffered and will continue to suffer monetary damages. Accordingly, Plaintiff is entitled to damages stemming from Defendant's breach of the Agreement.

**PRAYER FOR RELIEF**

WHEREFORE, Cross River respectfully requests that the Court enter judgment and relief in their favor and against Defendant as follows:

a.     a declaratory judgment, pursuant to CPLR § 3001, that Cross River did not breach the Agreement and Defendant did not validly terminate the Agreement;

b.     awarding Plaintiff damages for Defendant's breach of the Agreement;

c.     awarding Plaintiff damages in an amount to be determined at trial, including for pre-judgment interest, as well as fees and expenses incurred with respect to prosecting this action; and

d.     awarding Plaintiff all other relief as the Court deems just and equitable.

17

Dated: October 11, 2023
      New York, New York

By:    */s/ George Mastoris*

**WINSTON & STRAWN LLP**
George E. Mastoris
Thania ("Athanasia") Charmani
200 Park Avenue
New York, NY 10166
gmastoris@winston.com
acharmani@winston.com
(212) 294-6700

Abbe David Lowell
1901 L Street, NW
Washington, DC 20036
adlowell@winston.com
(202) 282-5000

*Attorneys for Plaintiff*

18